**In re DETROIT AUTO DEALERS ASSOCIATION, INC., et al.,**

**BARNETT PONTIAC–DATSUN, INC., et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

Nos. 89–3388 to 89–3392.

United States Court of Appeals, Sixth Circuit.

Argued March 12, 1990.

Decided Jan. 31, 1992.

Kathleen McCree Lewis, Dykema & Gossett, Roy R. Hunsinger (briefed), Stringari, Fritz, Kreger, Ahearn, Bennett & Hunsinger, Detroit, Mich., Glenn A. Mitchell (argued and briefed), Stein, Mitchell & Mezines, Washington, D.C., for petitioners in No. 89–3391.

Donald S. Clark, Secretary, David C. Shonka (argued and briefed), Office of the General Counsel, F.T.C., Washington, D.C., for respondent.

Lawrence F. Raniszeski (briefed), Colombo & Colombo, Birmingham, Mich., Kathleen McCree Lewis, Dykema & Gossett, Detroit, Mich., Glenn A. Mitchell (argued and briefed), Stein, Mitchell & Mezines, Washington, D.C., for petitioners in No. 89–3390.

Kathleen McCree Lewis, Dykema & Gossett, Detroit, Mich., James F. Rill, Jeffrey W. King, Christopher J. MacAvoy (briefed), Collier, Shannon & Scott, Glenn A. Mitchell (argued and briefed), Stein, Mitchell & Mezines, Washington, D.C., for petitioners in No. 89–3392.

Kathleen McCree Lewis, Dykema & Gossett, Detroit, Mich., Glenn A. Mitchell (argued and briefed), Basil J. Mezines (briefed), David U. Fierst (briefed), Stein, Mitchell & Mezines, Washington, D.C., for petitioners in No. 89–3388.

Kathleen McCree Lewis, Dykema & Gossett, Detroit, Mich., Glenn A. Mitchell (argued and briefed), Stein, Mitchell & Mezines, Howard E. O'Leary (briefed), Washington, D.C., for petitioners in No. 89–3389.

Before RYAN, Circuit Judge, LIVELY and WELLFORD *, Senior Circuit Judges.

WELLFORD, Senior Circuit Judge.

The respondent, Federal Trade Commission (FTC), issued a final order bearing upon trade practices of Detroit area automobile dealers after a lengthy investigation on February 22, 1989. By this challenged order, FTC held invalid and illegal an agreement or agreements to limit hours of

---

* The Honorable Harry W. Wellford assumed senior status on January 21, 1991.

operations among the competing automobile dealers involved in this controversy, and their trade associations. Most of the more than ninety dealers, some eighteen trade associations, and seventy-eight individual principal owners or operators of the automobile dealerships have petitioned to set aside the FTC order.

In 1984, the FTC issued an administrative complaint against petitioners and others charging them with arbitrary and anticompetitive action in keeping their automobile showrooms closed all day Saturdays and on three weekday evenings through alleged coercive and unlawful means (an asserted violation of 15 U.S.C. § 45). After hearings on this complaint, the administrative law judge (ALJ) issued an initial decision on July 14, 1987, in which he found that petitioners' agreement to limit showroom hours was engendered by labor disputes with automobile salesmen, and concluded that there was no violation as charged. FTC counsel appealed to the entire Commission, which unanimously reversed the ALJ decision, holding that, at least in part, the agreement constituted an effort by competitors to avoid collective bargaining with salesmen and, ultimately, unionization.

The Commission held that the agreement to limit showroom hours was not the product of arms' length negotiations, was designed to frustrate labor negotiations with the salesmen, and that antitrust laws should be held to apply to this type conduct. In sum, the Commission held that the claimed nonstatutory exemption did not apply and that the agreement brought about a restraint on "an important form of output and a dimension in which new car dealers compete" without an adequate efficiency showing, or other justification.

Petitioners defended unsuccessfully against the administrative charges by contending that there was no adverse effect on new car prices in the Detroit area, and that, under all the circumstances, the agreement was reasonable and legitimate. The order,

which is now the subject of appeal, barred dealers from continuing to operate under the agreement's limited showroom hours, and it prohibited petitioners from inducing others to abide by the agreement in this respect. The order required dealers to stay open at least 64 hours per week for one year and to advertise these extended open hours of operation. Petitioner associations are required to keep transcripts of all business meetings for five years and (1) to amend any bylaws inconsistent with the order; (2) to prohibit discussions of hours of operation; and (3) to expel members who violate the proscription about hours of operation. Finally, the FTC order mandated certain reporting in order to monitor compliance, and the furnishing of copies of the order to employees. Petitions for review of individual dealers and associations concerned were timely filed and have been consolidated. They meet the requirements of *Minority Employees v. Tennessee*, 901 F.2d 1327 (6th Cir.), *cert. denied sub nom., Davis v. Tennessee Dept. of Employment Sec.,* —— U.S. ——, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990), in all respects.[1]

It is undisputed that the business of each petitioner is in retail sales of new automobiles in the Detroit metropolitan area, and that the agreement in dispute among petitioners is not directly mandated by any multi-employer collective bargaining agreement. In 1959, when a labor organization began efforts to unionize salesmen, most of the petitioners and other dealerships selling new cars in Detroit were open every weekday night and on Saturdays as well. Two competing unions were involved in unionization attempts by 1960. Each demanded multiemployer bargaining, uniform work weeks, shorter hours, higher commissions, and other benefits. As a consequence, by agreement among themselves, petitioners, and others, began to reduce hours that showrooms were open.[2] The FTC complained that the series of agreements resulting in shorter hours were not with un-

---

1. William Hickey, one of petitioners in No. 89–3391, is now deceased and he has been dismissed from the proceeding.

2. Detroit Automobile Dealers Association (DADA) recommended during 1959 that dealers close two nights a week.

ions nor with salesmen, but were arranged among petitioners to forestall growing and bitter disputes concerning hours of operation. Petitioners emphasize that the agreements were the result of demands by salespersons, or their purported representatives, to reduce the long working hours without reducing their income.

There is little dispute about the fact that at dealer association meetings union demands were discussed and the associations and members determined to resist unionization vigorously. The unions lost most of their 1959 efforts to unionize after two night closings were effectuated. By 1973, petitioners concede that they were closed at night except Mondays and Thursdays, and also closed all day Saturdays. The ALJ was persuaded by petitioners that the reduction of hours was "the *result* of a labor dispute—the give and take of a struggle between labor and management." (Emphasis added). The ALJ also held that "[s]ome closings were in fact collectively bargained," and that "[s]ales employees negotiated a prohibition on reopening." He also decided that "sales employees and their unions reinforced their demands for uniform shorter hours by intimidation and violence on many occasions and over many years," and that "[s]ome dealers agreed orally and informally with sales employees and their unions to meet the demands for uniform shorter hours." All this, he concluded, was "part of the collective bargaining process." At the same time, it seems clear that DADA was engaged in concerted and consistent efforts to "persuade" those uncooperative dealers who were not complying with the shorter hours arrangement to do so. Not only did the ALJ find the labor exemption to apply, he also concluded that the constricted hours of operation did not bring about any substantial injury to competition nor to consumers in the form of higher prices for new cars.

During the 1970s, the Teamsters Union made further organizational efforts, including picketing and institution of strikes, on behalf of dealer sales personnel using Saturday closings as a basis for recruitment.

The union was unable to attain this general goal, however, through collective bargaining with dealers, their association, or their representatives, but the Teamsters Union did attain agreements not to extend existing hours of operations. Both the dealers and their sales personnel were concerned about competitors staying open longer hours and thereby drawing business away from "cooperating" dealers. There was some evidence that dealers thought the Saturday closings brought about less customer shopping for lower prices and thus increased dealer profit margins. There was evidence of violence and intimidation by salespersons and others, including union sympathizers, to bring about shorter hours. Petitioners uniformly and consistently resisted multi-employer bargaining to thwart the union's efforts in this regard. The Commission concedes that a "decision not to form a multi-employer bargaining unit is not fatal to respondents' nonstatutory labor exemption defenses."

FTC points out that Detroit is the only area in the country which has new car dealers closed on Saturdays. Petitioners claim the closings came about to accomplish labor peace and in response to union and salespersons' constant pressure. Dealers who did open, or attempt to open, on Saturdays have been subject to picketing, threats, violence, and damage to their property, and some of this picketing has been on the part of sales personnel.

This case presents an issue of first impression and of great difficulty and has been vigorously pressed by both parties. Petitioners' position is set forth succinctly in their brief at 9:

The Federal Trade Commission erred as a matter of law and of fact in ruling that the uniform reduction of business hours by automobile dealers was not exempt from the antitrust laws pursuant to the nonstatutory labor exemption. The FTC also erred in finding and concluding that the uniform reduction of hours constitutes a restraint of trade in violation of Section 5 of the FTC Act. 15 U.S.C.

… 

§ 45.[3]

The FTC summarizes its position in response as follows:

The Commission correctly held that the nonstatutory labor exemption is a narrow adjunct to the statutory exemption, and that its application requires a balancing between the congressional policies favoring competition and those favoring bona fide labor negotiations [and] ... should be subject to close scrutiny.

Substantial evidence supports the Commission's finding in this case that the dealers agreed among themselves and not with their employees. Indeed, the dealers admit that they entered into their agreement to avoid labor negotiations and to frustrate the unionization effort. The Commission properly found that the dealers' agreement restricting showroom hours did not result from bona fide arms' length labor negotiations.

In reviewing the FTC decision, we gave plenary review to its analysis of legal issues, but it is entitled, nevertheless, to some deference. *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). We must determine whether the interpretation of the statute in this case made by FTC, a government agency, is "reasonable, consistent, and persuasive." *Whiteside v. Secretary of Health & Human Servs.*, 834 F.2d 1289, 1292 (6th Cir.1987).

On the other hand, the FTC's findings of fact, "if supported by evidence," are determinative. 15 U.S.C. § 45(c); *Indiana Federation of Dentists*, 476 U.S. at 454, 106 S.Ct. at 2015. We review these findings on the standard of whether there is substantial evidence in the record to support the finding made, not on a preponderance of evidence standard. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We will "accept the Commission's *findings of fact* if they are supported by 'such relevant evidence' as a *reasonable* mind might accept as adequate to support a conclusion." *Indiana Federa-*

*tion of Dentists*, 476 U.S. at 454, 106 S.Ct. at 2015 (quoting *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 458) (emphasis added).

## I. NONSTATUTORY LABOR EXEMPTION

The parties seem to agree that the purpose of the nonstatutory labor exemption is to advance policies and objectives of the labor laws including "association of employees to eliminate competition over wages and working conditions." *Connell Construction Co. v. Plumbers & Steamfitters, Local Union No. 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1834, 44 L.Ed.2d 418 (1975). Petitioners argue that what was done to limit showroom hours was, in effect, done by salesperson employees who may act in concert to achieve better working conditions whether through a union, or otherwise, citing *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). That case, however, concerns the undoubted right of employees to act in concert against their own employer over a legitimate issue of working conditions under § 7 of the National Labor Relations Act. The question in *Washington Aluminum Co.* concerned only a few employees of the respondent company who had been terminated due to engaging in a work stoppage over claimed unreasonable and intolerable working conditions.

We find a paucity of cases dealing with this labor exemption issue. *National Ass'n of Women's & Children's Apparel Salesmen, Inc. v. FTC*, 479 F.2d 139 (5th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 360, 38 L.Ed.2d 240 (1973), dealt with an appeal from a FTC cease and desist order precluding NAWCAS, an association of ready-to-wear clothing salespersons, from refusing to deal with certain manufacturers from regional trade shows sponsored and carried on by NAWCAS. Among other things, in discussing the nonstatutory labor exemption, the court observed that "the antitrust laws yield only insofar as the

---

**3.** As a back up position, petitioners assert that the FTC order, in any event, "violates the Norris–LaGuardia Act whether or not the exemp- tion applies [by forcing] dealers to violate the labor laws by preventing bargaining on mandatory subjects of bargaining."

union pursues legitimate subjects of collective bargaining." *Id.* at 144. The association in *National Ass'n* was deemed disqualified from functioning as a labor organization under the circumstances of that case, which did not involve directly an employer's refusal to bargain with or to recognize a legitimate labor organization.[4]

Another court considered the nature and background of the nonstatutory labor exemption to the antitrust laws in *Amalgamated Meat Cutters & Butchers Workmen, Local Union No. 576 v. Wetterau Foods*, 597 F.2d 133 (8th Cir.1979):

> [I]t is necessary to examine congressional intent in the context of accommodating the Sherman Act to the policies of federal labor laws. The antitrust laws were enacted to prevent restraints to free competition in business and commercial transactions that tend to restrict production, control prices or otherwise control the market to the detriment of consumers. *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). They were not enacted to regulate labor relations.
>
> Congress provided a statutory labor exemption from the antitrust laws. 15 U.S.C. §§ 17 and 26; 29 U.S.C. §§ 52, 104, 105 and 113; *see Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621, 622, 95 S.Ct. 1830 [1834], 44 L.Ed.2d 418 (1975). Although these statutes do not directly address the activities involved in this case where the agreement is between two employers, these statutes demonstrate a congressional purpose to restrict the application of the antitrust laws when they unduly interfere with the goals of federal labor law. In resolving conflicts in areas where federal antitrust and labor policies seemingly overlap, the Supreme Court has recognized a nonstatutory labor exemption.
>
> . . . .

> Defining the boundaries of this exemption has not proved an easy task. A court must balance the degree of interference with federal labor policy with the magnitude of the restraint of trade and whether the restraint directly or indirectly affects market prices and free competition for the consuming public.

*Id.* at 135, 136 (footnotes omitted).

*Wetterau* found that the agreement between two employers to furnish workers to a party strike bound employer did not violate antitrust laws and "had no purpose or effect beyond the scope of the labor dispute, [and] ... had no anticompetitive effect unrelated to the collective bargaining negotiations." *Id.* at 135, 136. The nonstatutory labor exemption was therefore found to apply. *See by analogy Newspaper Drivers & Handlers Local No. 372 v. NLRB*, 404 F.2d 1159 (6th Cir.1968), *cert. denied*, 395 U.S. 923, 89 S.Ct. 1775, 23 L.Ed.2d 240 (1969); *see also Mackey v. National Football League*, 543 F.2d 606, 612 (8th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) ("under appropriate circumstances, we find that a non-labor group may avail itself of the [nonstatutory] labor exemption.").[5] *Mackey* discussed the nonstatutory labor exemption at some length and held that it turned "upon whether the relevant federal labor policy is deserving of pre-eminence over federal antitrust policy under the circumstances of the particular case." *Id.* at 613.

The FTC cites *Mackey* in support of its position as follows:

> [T]he policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining.

543 F.2d at 614.

Courts have declined, in any event, to adopt a *per se* analysis of the nonstatutory labor exemption issue "in favor of an inquiry into the reasonableness of the re-

---

**4.** The court discussed the standard of review in a footnote: whether or not "the evidence in the record reasonably supports the administrative conclusion." *Id.* at 145 n. 10.

**5.** *Mackey* held also that "the basis of the nonstatutory exemption is the national policy favoring collective bargaining." 543 F.2d at 612.

straint under the circumstances." *Mackey*, 543 F.2d at 619, *citing White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Worthen Bank & Trust Co. v. National Bank Americard, Inc.*, 485 F.2d 119 (8th Cir.1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).

We adopted the standards set out in *Mackey* in analyzing another professional sport controversy between a hockey player and the National Hockey League. Those standards deemed to be proper in *Mackey* were reiterated in *McCourt v. California Sports, Inc.*, 600 F.2d 1193 (6th Cir.1979):

First, the labor policy favoring collective bargaining may potentially be given pre-eminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining. Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining.

*Id.* at 1197–98 (citations omitted).

In *McCourt*, unlike *Mackey* in the dispute with the NFL, we found that the parties had been engaged in "good faith, arm's-length bargaining" recognizing that "nothing in the labor law compels either party ... to yield on its initial bargaining position." *Id.* at 1200. Thus, we held that the nonstatutory labor exemption applied to the owners' actions.

The delicate balancing involved in the labor exemption may be observed in the following expressions from *Connell Construction Co. v. Plumbers*, 421 U.S. at 622–23, 95 S.Ct. at 1834–35:

Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, *e.g., Federation of Musicians v. Carroll*, 391 U.S. 99 [88 S.Ct. 1562, 20 L.Ed.2d 460] (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market.

(Citations omitted).

■ The FTC argues that because the agreement at issue was among dealers, not involving unions or employees, there was a direct antitrust violation through restraint of trade by means of closing of showrooms and foreclosing availability of new cars to the public. FTC adds that the purpose of the dealers' agreement was "to avoid collective bargaining and to obtain the benefits of reduced competition ... [and to avoid] arm's-length good faith bargaining." Petitioners respond that they were forced, through union and collective salesperson pressure, to reach agreement on standardized and uniform—and limited—showroom hours. We must decide whether the agreement should be subject to the nonstatutory labor exemption and therefore be immunized from antitrust scrutiny.

Although the great bulk of salespersons involved with petitioners are nonunion employees, we have stated that the labor laws recognize no distinction between "union and unorganized employees who ... join[ ] in concerted actions to deal with their grievances." *Vic Tanny Int'l, Inc. v. NLRB*, 622 F.2d 237, 241 (6th Cir.1980). *See NLRB v. Loyd A. Fry Roofing Co.*, 651 F.2d 442, 445 (6th Cir.1981).

■ The statutory labor exemption from antitrust laws specifically provides for labor unions and labor organizations. Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52;

Norris–LaGuardia Act, 29 U.S.C. §§ 104, 105, 113; *Connell,* 421 U.S. at 621, 622, 95 S.Ct. at 1834, 1835. This exemption may only be asserted by a labor organization itself, not by employers. *James R. Snyder Co. v. Associated Gen. Contractors,* 677 F.2d 1111, 1118 n. 10 (6th Cir.), *cert. denied,* 459 U.S. 1015, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982); *United States v. Hutcheson,* 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941).

■ The nonstatutory labor exemption is not so narrowly limited; it extends antitrust immunity to both labor unions, employees, and to non-labor parties; those who have engaged in *bona fide* labor negotiations. *Connell* recognized a "limited nonstatutory exemption from antitrust sanctions" to a union-employer agreement which limited competition based upon favored collective bargaining principles. 421 U.S. at 622, 95 S.Ct. at 1834; *but cf. Carpenter's Local Union No. 1846 v. Pratt–Farnsworth,* 690 F.2d 489 (5th Cir.1982) (nonstatutory exemption only incidentally applicable to employers; not applicable when employers combined to hire only non-union contractors and subcontractors), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

The FTC concedes that there were some dealers among petitioners that negotiated agreements with labor unions. The FTC decision, however, held that these negotiated agreements "simply perpetuated the results of earlier collusions" between petitioners. Further, the FTC argues that even if some negotiations took place, these few "cannot shield an otherwise anticompetitive agreement." *Allen Bradley Co. v. Local Union No. 3,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). On the other hand, petitioners maintain that because a few petitioners negotiated agreements with a union concerning hours of work, all are protected by the nonstatutory labor exemption.

Hours of work have been held to be "subjects ... about which employers and unions must bargain." *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea,* 381 U.S. 676, 691, 85 S.Ct. 1596, 1602,

14 L.Ed.2d 640 (1965). Similarly, hours during which automobile showrooms will be open by employer dealers are subjects of bargaining between dealers and their employees, whether or not represented by a union. In *Jewel Tea,* the Court held that an agreement, reached through "bona fide, arm's-length bargaining" limiting the number of hours retail meat departments would be open to the public (closing at 6 p.m.) was "beyond the reach of the Sherman Act." *Id.* at 690–91, 85 S.Ct. at 1602–03. The decision was based on the rationale that working hours were "a subject of immediate and legitimate concern to union members," *id.* at 692, 85 S.Ct. at 1603, without any extended analysis as to whether and to what extent this limitation affected the public adversely in the antitrust context. In *Jewel Tea,* the limitation upon hours of operation in retail grocery meat departments was imposed by a powerful combination of meat cutters, the defendant union, upon a recalcitrant employer operator, Jewel Tea, after reaching an agreement with other grocery operators in the Chicago area. Here, by contrast, the FTC claims to represent the public interest by protecting the public's ability to buy during longer hours as opposed to the workers' group claim to represent the public interest through limitation of hours as in *Jewel Tea.* The question remains: was this done by Detroit car dealers after or through a process of bona fide, arm's-length dealing with car salespersons and their representatives, as was found to be the situation in *Jewel Tea?* Or is the situation in our case like that described in *Jewel Tea* as "not exempt from the Sherman Act ... an effort by the unions [or associations of dealers] to protect one group of employers from competition by another?" *Id.* at 693, 85 S.Ct. at 1603; *see also International Ass'n of Heat & Frost Insulators v. United Contractors Ass'n,* 483 F.2d 384, 393 (3d Cir.1973), *amended,* 494 F.2d 1353 (1974). If the latter, then the case by the FTC depended "on whether the elements of a conspiracy in restraint of trade or an attempt to monopolize had been proved [and] whether the restraint was unreasonable." *Id.* 381 U.S. at 693 & n. 6, 95 S.Ct.

at 1603 & n. 6 [6]; *California State Council of Carpenters v. Associated Gen. Contractors, Inc.,* 648 F.2d 527, 544 (9th Cir.1980) (denial of rehearing en banc), *rev'd on other grounds,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

The FTC found that the agreement in controversy in this case was "an unlawful restraint of trade," or "an unfair method of competition in violation of Section 5 of the Federal Trade Commission Act," as charged in the FTC complaint. The FTC final opinion recited the undisputed history of restricting new car sales operations by dealers and the efforts of DADA "to bring remaining members [still operating on Friday nights in 1964] into compliance" with a Friday night closing policy, and later similar efforts concerning Tuesday night closings. The opinion also. recognized that salespersons wanted shorter showroom hours, and particularly, *"uniform* showroom hours," and that, beginning in the 1950s unions seeking to organize salespersons were demanding uniform shorter showroom hours through attempted multi-employer bargaining. Petitioners were advised by their counsel to resist multi-employer bargaining in order to avoid unionization of salespersons. The FTC agreed with the ALJ's finding that counsel also advised petitioners in order to effect this goal "to make uniform concessions to sales employees."

The FTC also recognized that there were a number of strikes at individual dealers in connection with similar union organizing attempts by a new union in 1967 and 1968, some of which were "lengthy ... involved violence, threats of violence, and vandalism." "The question of shorter hours focused on Saturdays." [7] By 1970, salespersons rallied and petitioned DADA to close on Saturdays. There were additional strikes during the early 1970s; "threats, physical assaults, and property damage were common," and dealers "were apparently unable to resolve the salesmen's com-

plaints." The FTC further opined that "ultimately, the dealers concluded the only way to avoid unionization and to achieve labor peace was to give in to the demand for uniform, year-round Saturday closings."

The ALJ and the Commission reached different conclusions essentially on these same factfindings concerning applicability of the nonstatutory labor exemption. The Commission focused on direct "collective bargaining" as the key element of the nonstatutory labor exemption, citing *Mackey,* and *Zimmerman v. National Football League,* 632 F.Supp. 398 (D.D.C.1986). At the same time it conceded that the exemption is not limited "only to collective bargaining agreements [nor to] formal labor contract[s]." In *Richards v. Neilsen Freight Lines,* 810 F.2d 898 (9th Cir.1987), an independent trucker sued four major truckers and the union that represented employees of the defendants claiming an antitrust violation in the form of a conspiracy among defendants to boycott plaintiff and force it to recognize the defendant union. *Richards* held that "any restraint the Union imposed falls within the scope of the nonstatutory labor exemption to the antitrust laws." *Id.* at 904. That court went further to hold:

> Even if such conduct were a violation of the labor law, it would bear such a close and substantial economic relation to a union's legitimate attempt to organize a specific employer that it falls well within the purpose and the coverage of the exemption from antitrust liability.

*Id.* at 904.

In *Richards,* Judge (now Justice) Kennedy found the purpose of such exemption was "to permit employees to organize and act to improve wages and working conditions." *Id.* at 905; *cf. California State,* 648 F.2d at 544. The court in that case required plaintiff to demonstrate that defendant's actions, even if in concert and

---

**7.** The new union, ASA, won elections at 100 dealerships, and negotiated collective bargaining agreements with 29 of these, but ASA was not successful at ending Saturday work.

triggered by defendant union, "created substantial anticompetitive effects tangential or unrelated to the legitimate central purpose of organizing a company." *Id.* at 905. While we believe *Richards* goes to the extreme in protecting union activity to organize an employer and force it to submit to a "standard" or uniform union contract utilized with union carriers as being covered by the nonstatutory labor exemption, that case does recognize that the exemption may apply to situations where a collective bargaining restraint had not already been applied to the plaintiff, and the Commission recognized *Richards* as authority to this effect. On the other hand, in *Zimmerman*, 632 F.Supp. 398, the court held that a "direct restraint on the business market is not shielded by the labor exemption." *Id.* at 405 ("agreements that primarily affect competitors of the employer or ... economic actors completely removed from the bargaining relationship" are not protected.).

By contrast, the Commission viewed the agreement in controversy here as "inherently suspect" in limiting hours of operation. The agreement was suspect because it "cut down" shopping, according to the Commission, thus preventing the "forcing down" of prices. "Showroom hours," in other words, were found to be "a basis on which dealers compete for customers." Next the Commission found that petitioners had shown "no valid procompetitive justifications." [8] This difference of opinion between the ALJ and the Commission on the same facts illustrates both the complexity and difficulty of this case which differs materially from the relatively few cases which have analyzed and considered this exemption in other factual contexts.

■ While we review the legal conclusions essentially de novo, we owe some measure of deference to the Commission's conclusions and its "informed judgment" in this area dealing with alleged unfair and anticompetitive commercial conduct of a large group of competitors who have formed together without dispute to agree upon hours of operation and to bring pressure upon the similarly situated dealers to comply. *Indiana Federation of Dentists*, 447 U.S. at 454, 106 S.Ct. at 2015. Petitioners strenuously argue that the alleged anticompetitive conduct was motivated by a desire for labor peace and that the agreement primarily benefitted salespersons who pressured them over a long period of time for shorter, and uniform, hours of operation. The FTC argues that there was no negotiation with labor unions, or even arm's length bargaining with representatives of salespersons, that brought about the agreement.

Our examination of the opinion of the Commission satisfies us that it considered carefully the background and factual circumstances involved in the ultimate agreement among petitioners to stay open only Monday and Thursday nights and to remain closed on Saturdays. We are also satisfied that the Commission analyzed and set out in its opinion the legal precedent and rationale for its decision. We find no error in the following specific legal conclusions of the Commission:

1. To say that collective bargaining is at the heart of the [nonstatutory labor] exemption, however, is not to say that the exemption applies only to collective bargaining agreements.

2. [T]he cases also demonstrate that concerted conduct does not automatically qualify for the exemption simply because it is motivated by labor concerns ... motivation by labor concerns is only a necessary and not a sufficient condition for application of the nonstatutory exemption.

3. The vast majority of nonstatutory labor exemption cases involve some sort of concerted activity or agreement between a union and an employer.

4. [T]hose few cases [involving only employers] clearly show that the nonstatutory labor exemption protects employer

---

**8.** Lower dealer overhead and attracting higher calibre salespersons were discussed briefly and dismissed as insufficient in this regard. These reasons given by petitioners may not be "justifications," but they may represent valid bases for actions that have relationship with competitive purposes.

agreements only when those agreements are part of the give-and-take of a negotiation process.

5. [T]he agreement ... was designed to *prevent* collective bargaining ... to *avoid* arm's length negotiation.

6. The mere fact that sales employees benefit from the hours restraint also cannot justify granting an exemption ... since they have the same incentive to reduce competition as the dealers.

7. *Jewel Tea* [381 U.S. at 676, 85 S.Ct. at 1596] and the present case have superficial similarities. Both involve a restriction on marketing hours and efforts by labor unions to obtain shorter working hours. But in *Jewel Tea*, unlike the case before us, the agreement was one to which the employees and employers were parties. Moreover, there was no question in *Jewel Tea* that the restrictive agreement had been reached through bona fide, arm's length bargaining.

8. Respondents [petitioners here as a group] have agreed among themselves, not with their employees.

9. [T]he decision not to form a multi-employer bargaining unit is not fatal to [the] nonstatutory labor exemption defense.

Petitioners rely on *Jewel Tea*, but we find the distinctions pointed out by the Commission are well reasoned. Both sides cite *Mackey*. Again, we believe that the Commission's analysis of that case (and the standards applicable to a nonstatutory labor exemption), as adopted by this court in *McCourt*, 600 F.2d 1193 (6th Cir.1979), is sound and that the petitioner's reliance thereon is misplaced under the circumstances.

In sum, we are not persuaded that the legal reasoning of the Commission is erroneous as to the non-applicability of the nonstatutory labor exemption generally under the circumstances of this case. We find the question to be particularly difficult in light of the undoubted desire of petitioners to obtain labor peace in adopting the restrictions on showroom hours. This desire on the part of the dealers was generated by violence, assaults, vandalism, threats,

and pressure from union adherents and many sales personnel to bring about shorter hours and multi-employer bargaining and resultant uniformity. The agreement also came about, in part, upon the advice of labor counsel to petitioners as to the best way to avoid violent confrontation and threats of violence to dealers and to prevent unionization. We agree with the Commission that the process generally was not, nevertheless, a direct product of employer collective bargaining, nor of arm's length dealing with salespersons.

## II. INDIVIDUAL DEALERS WHO ENTERED INTO COLLECTIVE BARGAINING AGREEMENTS AND/OR SHORTENED HOURS UNDER UNION THREATS

We must next consider whether the above conclusion applies to all of the petitioner dealers. Here we have problems with the legal conclusion reached by the Commission. The record indicates that some of the petitioner dealers entered into collective bargaining agreements with unions representing their sales employees which specified hours of showroom operation. The Commission acknowledged that some dealers did sign such agreements but only a "very few."

We have agreed with the FTC's conclusion generally that the agreement in controversy was not subject to the nonstatutory labor exemption claimed by petitioners. We now consider whether this same conclusion applies to the distinct minority of petitioner dealers who entered into collective bargaining agreements with unions representing their sales employees with specified hours of showroom operation. It is not clear to us under the *factual* findings whether under these several separate collective bargaining agreements there was bona fide negotiation and effectual limitation of showroom hours. That the agreement on showroom operating hours was not reached through *bona fide* negotiations and was rather a part of pre-existing collusion is a legal conclusion, not a factual finding, as to the "few" dealers who signed

or entered into union contracts dealing with hours of operation.

The Commission concluded that any such union contract limitation of showroom hours by the few dealers involved "incorporated ... reductions orchestrated by DADA ... [and] simply perpetuated the results of earlier collusion." If, however, direct negotiations and collective bargaining with salesperson employees or their representatives, by any petitioner actually brought about additional or different limits on showroom hours of operation, any such dealer or dealers may well be able to claim a nonstatutory labor exemption.

We believe that a remand is appropriate, therefore, for further Commission consideration on this particular question. Further proof may be presented on this issue, if necessary. Such individual dealer-employee/union negotiations, if in apparent good faith, should not be discounted merely because they brought about an agreement in order to attain labor peace. The important question, as stated by FTC is "whether *bona fide* bargaining took place" with respect to restrictions on hours of operation. (Citing *Zimmerman v. National Football League*, 632 F.Supp. 398). The agreement before the Commission and before us now, without question, is the "agreement among dealers to establish uniform showroom hours," but we find it material for the FTC to consider whether separate dealer-union agreements existed with unions which "contained bargained-for hours restrictions," which were the product of genuine collective bargaining.

The ALJ made extensive fact findings and conclusions concerning individual dealer closeups during weekday evenings and, especially, during Saturdays. The ALJ

found that a number of dealers closed by reason of agreements with a union and others were forced to close due to strikes and union violence. The Commission concluded, however, to the contrary that "it would be improper to impute to the respondents' agreement any protection the nonstatutory exemption may offer individual dealer-employee negotiations." While we agree with the Commission that the dealer's *association*, the collective group of dealers, cannot properly claim the benefit of the nonstatutory exemption for the reasons we have discussed, we disagree that individual dealers should not be carefully considered and examined individually with respect to whether some may actually have negotiated with unions or representatives for shorter showroom hours in good faith (or under force and threats of vandalism, violence, picketing and property damage).

Our remand, then, concerns a requirement that the Commission consider carefully the record and the ALJ findings regarding any individual dealers who may be entitled to claim an exemption under the circumstances of bona fide collective bargaining with a union for shorter showroom hours or as a direct result of *union directed* violence and force for shorter showroom hours.[9] The Commission made no adequate analysis of the ALJ factfinding and conclusions in this regard, nor did it state whether or why the ALJ findings were not supported by evidence in the record. *See* n. 9. In sum, we remand for the Commission to determine whether there was a restraint on hours of showroom operation *imposed by a union* rather than by the collective agreement with and among the other dealers or the association. *See Rich-*

9. The ALJ concluded, among other things:
1. "[s]ome closings were in fact collectively bargained;"
2. "[s]everal respondents [petitioners] did negotiate collective bargaining agreements with an hours restraint;"
3. "[t]he record shows that the parties to bargaining agreements treated the shorter hours as a contractual requirement;"
4. "[t]he parties to Teamsters' labor contracts, for example, interpreted the 'maintenance of standards' provision in the written

collective bargaining agreements to preclude dealers from opening on Saturday;"
5. "[t]he sales employees *and their unions* reinforced their demands for uniform shorter hours by intimidation and violence...." (emphasis added);
6. "[s]ome dealers agreed orally and informally with sales employees *and their unions* to meet the demands for uniform shorter hours. This was part of the collective bargaining process" (emphasis added; footnote omitted).

*ards v. Neilsen Freight Lines,* 810 F.2d 898.

When the Commission overrules the ALJ and substitutes its own findings, we should carefully scrutinize the Commission's determinations of fact, and therefore its conclusions based upon those facts. Our task, however, is to determine whether the Commission's findings are supported by substantial evidence. *Thiret v. FTC,* 512 F.2d 176 (10th Cir.1975). The FTC conclusions will be upheld if supported by such relevant evidence that a reasonable mind might accept as adequate to support that conclusion. *Sterling Drug, Inc. v. FTC,* 741 F.2d 1146 (9th Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 143 (1985). We remand for the limited purposes indicated with these principles in mind.

### III. RESTRAINT OF TRADE

We believe that a Rule of Reason is the preferable analysis to apply to our consideration of petitioners' conduct under § 1 of the Sherman Act. We, therefore, make "an inquiry into the reasonableness of the restraint under the circumstances." *See Mackey,* 543 F.2d at 619.

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the pur-

pose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918) (quoted in *White Motor Co. v. United States,* 372 U.S. 253, 261, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963)).

The Supreme Court did not adopt a *per se* analysis of the allegedly anticompetitive conduct involved under an agreement among college members of the NCAA. *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984).[10] The FTC concludes that "showroom hours are an important form of output and a dimension in which new car dealers clearly compete." We agree with the Commission to the extent that showroom hours may be an area of competition among the dealers.

The Supreme Court has stated that it is slow to condemn rules of associations and agreements defining business relationship "where the economic impact of certain practices is not immediately obvious." *Indiana Federation of Dentists,* 476 U.S. at 459, 106 S.Ct. at 2018. Thus, we are disposed to apply here a Rule of Reason to consider the impact of the limitation of showroom hours upon competition in general, and upon new car customers, in particular, in the Detroit area since the impact appears to us not to be immediately apparent. We look, then, as was the case in *Indiana Federation of Dentists,* to see whether FTC has demonstrated "actual detrimental effects" or "the potential for genuine adverse effects on competition." *Id.* at 460, 106 S.Ct. at 2018. Giving the Commission's conclusion some deference, we,

---

**10.** In *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Court noted that a joint selling arrangement among potential competitors, although seemingly anticompetitive on its face, might provide sufficient operating efficiencies to render the restraint reasonable under the

circumstances. In *NCAA v. Board,* 468 U.S. at 103, 104 S.Ct. at 2961, the Court concluded that it must evaluate and consider under a Rule of Reason petitioners' "justifications for the restraints," and the anticompetitive effect of the action in question.

nevertheless, examine its conclusion in light of its findings, as supported by this record, to determine whether petitioners' justifications for their conduct are legitimate, plausible, substantial and reasonable. In this regard, we examine the evidence of the power of petitioners in the relevant market. *See Jetro Cash & Carry Enter. v. Food Distrib. Center,* 569 F.Supp. 1404, 1414 n. 7 (E.D.Pa.1983); *Amjac Ltd. v. Northlake Mall,* 1973–1 Trade Cas. (CCH) ¶ 74,150, at 94,290 n. 5 (N.D.Ga. 1973); *Dunkel Oil Corp. v. Anich,* 1944 Trade Cas. (CCH) ¶ 57,306 (E.D.Ill.1944); and *Ohio ex rel. Brown v. Cincinnati Automobile Dealers Ass'n,* 71 Ohio Op.2d 467 (1974).

We first examine the Commission's equation of reduction in hours of operation to reduction in "output." It may be, as stated in another part of the Commission's opinion, that agreed reduction of showroom operating hours is a limitation upon "a form of competition among dealers," but that is not quite the same thing as a limit upon production or output. The analysis made by the Commission for the proposition resulting in its conclusion of limitation of output and anticompetitive effect is based upon *Mass Bd. of Registration in Optometry,* DICT # 9195 (F.T.C. June 13, 1988). The Commission's equation of limited hours and reduction in "output" carried over to its analysis of petitioners' claims of operating efficiency in respect to reducing showroom hours. *See* note 22 of its decision and its discussion of "cost per unit of output." The analysis concerns three interrelated inquiries:

1) Is the restraint "inherently suspect?" ("absent an efficiency justification");

2) Is there a "plausible" efficiency justification for the practice? (Can it be "rejected without extensive factual inquiry?"); and

3) Is the justification "really valid?" (Assessed under the "full balancing test of the Rule of Reason").[11]

Based on what it stated was a "common sense approach," the Commission found limitation of showroom hours to be inherently suspect. It found that a car dealer was "a provider of sales and support services," and that its "output" is not measured in terms of units sold.[12] While this might force customers to shift their shopping hours, the commission makes no reference to nearby or suburban car dealers available to many customers not a part of petitioners' association. Citing Robert Bork from *The Antitrust Parodox* (1978), the Commission leaps to the conclusion "there is no economic difference between an agreement to limit shopping hours and an agreement to increase price." Bork himself stated however, while counselling to the contrary, that it is "presumably, more likely that a judge in the Brandeis tradition would uphold an agreement by automobile dealers to close on Sundays than an agreement by the same dealers to add $200 to the price of each car." *Id.* at 85 (1976). Unlike this example cited, there is no showing in this case, and the Commission can claim no reliance on a showing of higher prices or profit margins achieved by petitioners compared to other dealers similarly situated.

The Commission relies on expressions of hope by association representatives that costs would be reduced and that "grosses" would be "improved" and that hours limitation would also bring about "a better buying climate" and "cut down shopping." Whether these expressions or hopes were realized leads us to examine the other inquiries in the three-prong analysis of *Mass. Bd. of Registration of Optometry* utilized by the commission. We believe that the

---

**11.** In note 18 of its decision dealing with this analysis, the Commission makes reference to two recent Supreme Court decisions, *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), which followed a *per se* approach, which the Commission described as a "more traditional line," and then added: "[o]ur method of analysis is consistent with the traditional approach."

**12.** The Commission referred to "dicta" from *Jewel Tea* in support of its approach that limitation of hours was inherently suspect or an "obvious restraint." 381 U.S. at 692, 85 S.Ct. at 1603.

inherently suspect conclusion arises from a *per se* approach by the Commission absent a demonstrated effect on the price of cars in the Detroit area.[13] The Commission, moreover, cites *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, in support of its analysis, but neglects to note that the Rule of Reason was specifically adopted in that case.

The Commission concluded in note 22 that the "efficiency justifications" presented by the dealers "(1) lower dealer overhead costs, (2) the ability to attract higher-quality sales personnel, and (3) the prevention of unionization" were not "plausible." Although conceding that "dealer overhead may have been reduced," the Commission concluded that "unit costs did not decrease," based on its prior conclusion that there was a reduction in "output," that is, showroom hours of operation. Again, in note 22, the Commission cites *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), in support of its theory, again without recognizing that the Rule of Reason approach, was lauded in that case, which described it as giving "the [Sherman] Act both flexibility and definition ... [and] focus[ing] directly on the challenged restraint's impact on competitive conditions." 435 U.S. at 688, 98 S.Ct. at 1603. *Professional Engineers*, it should be further noted, bore directly on fees to be charged by the professional association ("a total ban on competitive bidding"), and thus the restraint was found to be subject to a *per se* rule. *Id.* at 696, 98 S.Ct. at 1367. The Commission found, moreover, that preventing unionization could not be "legitimate" justification for competitive purposes because of a "national policy *favoring* the association of employees to bargain in good faith with employers over wages, hours and working conditions." (Emphasis add-

ed). We are not sure such a policy, if it exists, precludes this purported justification,[14] but we have agreed with the Commission that the dealers' agreement does not come within the nonstatutory exemption, and that acts designed to impede union organization may be antithetical to a national labor policy.

The Commission cites *Indiana Federation of Dentists* to sustain its rationale that limiting showroom hours is inherently suspect and that the offered justifications were not plausible even if prices and profit margins were unaffected by the agreed limitations. While *Indiana Federation of Dentists* was not directly concerned with "price fixing as such," it noted particularly that the practice in question involved "the proposition that making it more costly for the insurers and patients who are the dentists' customers to obtain information needed for evaluating the dentists' diagnoses has [a] procompetitive effect." 476 U.S. at 459, 106 S.Ct. at 2018. The court further noted that

> [t]he premise of the [dentists'] argument is that, far from having no effect on the cost of dental services chosen by patients and their insurers, the provision of x rays will have too great an impact: it will lead to the reduction of costs [as to the patient or consumer] through the selection of inadequate treatment.

*Id.* at 463, 106 S.Ct. at 2020. Through a concerted boycott, dentists in *Indiana Federation of Dentists* denied to their patients and insurers relevant information whereby costs ultimately could be expected to be effected, and thus the Court held that actual price increase was not required to be proven even under a Rule of Reason approach. We perceive some difference between withholding of relevant cost information and restricting showroom hours, but in deference to the Commission, we are

---

**13.** The Commission does not contest that "the ALJ found no evidence that the Saturday closing caused an increase in retail prices of cars in the Detroit area, or that the hours reductions increased dealers' gross margins on sales."

**14.** The policy of the NLRA is to enable employees to organize for *collective* bargaining purposes for negotiating wages, hours, and condi-

tions of employment without hindrance from employers or unfair local constraints, statutory or otherwise. Whether this law *favors* such association, or whether it merely permits such association without unfair restraint or impediment, is another question. The unions which represented salesmen in this case worked hard to effectuate the limitation on showroom hours.

not prepared to hold the analogy to be erroneous.

The Commission concluded that prices may have risen "above competitive levels" even if they remained the same, because "we would expect car prices to have gone down in response to dealers' lower overhead costs." Note 24. Ultimately, the Commission concluded that there was no demonstrated "procompetitive efficiency justification," and thus the dealers' agreement in question "cannot be squared with the antitrust laws."

While we do not agree in all respects with the Commission's rationale, we find some legal basis and support for its conclusions in an area that is murky and unclear. Limitation of hours has been held to be an anticompetitive restraint although relief in that case was limited and the damages to users or customers was found to be "entirely speculative." *Tennessee, ex rel. Leech v. Highland Memorial Cemetery, Inc.*, 489 F.Supp. 65, 68 (E.D.Tenn.1980). We do not equate limitation of hours to price-fixing, but we do not find error in the Commission's conclusion that hours of operation in this business is a means of competition, and that such limitation may be an unreasonable restraint of trade.[15] We also find no error in the Commission's treatment of petitioners' other defenses (except as to II above).

## IV. SCOPE OF RELIEF

We defer generally to the discretion of the Commission with respect to relief ordered once there has been demonstrated an unreasonable restraint of trade. "[T]he courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 613, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). At the same time, courts have occasion to review the extent and scope of remedies ordered and have found them to be over broad or unjustified. *See Porter &*

*Doetsch, Inc. v. FTC*, 605 F.2d 294 (7th Cir.1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212 (9th Cir.1979); *Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977).

We find no error in parts I and II of the attached Commission final order issued February 22, 1989. As to part III requiring each dealership to operate for sales purposes "a minimum of 64 hours per week ... for a period of one year," we have concern that such an order is overly board and intrusive on the manner of operation, and without a reasonable relation to the practices condemned. We suggest that the Commission consider giving dealers an option to maintain showroom hours for at least an *average* of ten and a half hours a day during weekdays, coupled with operation on Saturdays for some minimum additional time for the one year period. This might serve as a permissible option to the mandated 64 hour week specified in part III, which we question as *reasonably* related to the improper practices determined.

We find no error in parts IV, V, and VI of the final order. We find no error in part VII A, B and C but direct that the Commission consider further whether 30 days is sufficient time to investigate a complaint, have a minimal hearing, and record the findings before expelling a purported violator. We take this remand action under our authority to "modify or set aside orders of the Commission." 15 U.S.C. § 45(d).

We find no error in parts VIII, IX, X, and XI of the final order.

We thus AFFIRM the Commission generally in this close and difficult case. We REMAND for limited purposes set out in part II, and for consideration of parts III and VIID of the final order on remedy.

---

**15.** Neither do we necessarily agree that "the parties' focus on retail prices misses the point in this case." Under a Rule of Reason analysis effect on prices, output and market forces in a competitive market of a particular practice is frequently relevant and may be determinative. The special factors noted in this case support the Commission's conclusion on restraint of trade despite lack of evidence of increased prices.

RYAN, Circuit Judge, concurring in part and dissenting in part.

In my view, the Federal Trade Commission's decision should be affirmed in its entirety. Although I will discuss my disagreement with the majority opinion in some detail, I note at the outset two overriding and related concerns.

## I.

First, the scope of our review of the FTC's determinations in this case is very limited. "[F]indings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S.C. § 45(c). The court "must accept the Commission's findings of fact if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 458, 95 L.Ed. 456 (1951)). Legal conclusions are "for the courts to resolve," but courts must give "some deference" to the Commission's interpretation of the statute it is charged with enforcing. *Indiana Fed'n of Dentists*, 476 U.S. at 454, 106 S.Ct. at 2015. Thus, we properly ask only whether the FTC's interpretation is "reasonable, consistent, and persuasive." *Whiteside v. Secretary of Health & Human Services*, 834 F.2d 1289, 1292 (6th Cir.1987). Respectfully, I do not believe the majority opinion satisfactorily adheres to these standards for review.

My second concern is that the majority opinion fails to offer any valid reasons for rejecting the FTC's factual findings and legal conclusions.

While I agree with the majority's conclusion that the nonstatutory labor exemption from the antitrust laws does not apply to the agreement among the dealers to restrict their hours of operation, I do not agree with the analysis employed in the rest of the opinion or with the order remanding the case to the FTC to essentially do once again what it has already done. In my view, the FTC's decision is well-reasoned and correct. I would affirm it in its entirety. Therefore, I concur in part I of the majority opinion and in the result in part III, and respectfully dissent from parts II and IV of the opinion.

## II.

In part II, the majority orders a remand to the FTC for the "limited purpose[ ]" of determining whether individual dealers might be able to take refuge under the nonstatutory labor exemption as the result of their "direct negotiations and collective bargaining with salesperson employees or their representatives...." On remand, the Commission is to "consider carefully the record and the ALJ findings regarding any individual dealers who may be entitled to claim an exemption under the circumstances of bona fide collective bargaining with a union for shorter showroom hours or as a direct result of *union directed* violence and force for shorter showroom hours." I can conceive of no reason, indeed no lawful basis, to order remand on this question since it is readily apparent that the FTC has already considered, and rejected, the dealers' position on this factual issue.

In addition to finding that the dealers' agreement to restrict hours was not protected by the nonstatutory labor exemption, the FTC found that collective bargaining agreements signed by a few dealers, which also restricted hours of operation, were also not protected:

> [T]hese agreements ... did not establish *bargained-for* showroom hours. The agreements merely incorporated, by means of maintenance of standards provisions, the pre-existing hours reductions orchestrated by DADA. Thus, those agreements did not memorialize hours limitations negotiated between dealers and employees; they simply perpetuated the results of earlier collusion.

In determining whether the nonstatutory labor exemption applied, the FTC used the correct legal analysis as "[t]he important question is whether *bona fide* bargaining took place such that the policies in favor of

such bargaining should take precedence over antitrust concerns." *Zimmerman v. National Football League*, 632 F.Supp. 398, 408 (D.D.C.1986); *see also Mackey v. National Football League*, 543 F.2d 606, 614 (8th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *Bona fide* bargaining does not occur where one party unilaterally imposes a provision on a weaker party or where the agreement merely incorporates a preexisting rule. *See Mackey*, 543 F.2d at 613, 615–16.

In this case, the FTC found as a fact that the agreement on hours had not been reached through *bona fide* negotiations but instead was merely the incorporation of the preexisting collusion. This factual finding that the "maintenance of standards" provisions were not the result of arm's length negotiations should be determinative. 15 U.S.C. § 45(c). The majority opinion, however, states:

> It is not clear to us under the *factual* findings whether under these several separate collective bargaining agreements there was bona fide negotiation and effectual limitation of showroom hours. That the agreement on showroom operating hours was not reached through *bona fide* negotiations and was rather a part of pre-existing collusion is a legal conclusion, not a factual finding, as to the "few" dealers who signed or entered into union contracts dealing with hours of operation.... If ... direct negotiations and collective bargaining with salesperson employees or their representatives, by any petitioner actually brought about additional or different limits on showroom hours of operation, any such dealer or dealers may well be able to claim a nonstatutory labor exemption.

The majority is correct that "if" arm's length negotiations on hours occurred, such activity would be protected. It fails, however, to suggest any reason why the FTC's finding that no such arm's length negotiations occurred should not be accepted and, indeed, binding. The Commission specifically found that while the provisions "effectively prohibited some individual dealers from *extending* their hours of operation ... [they] did not have the effect of

requiring dealers to close on Saturday unless they were already doing so when the contract was signed." Thus, the Commission found that any agreement between individual dealers and their employees or any union to reduce or restrict the hours of operation merely incorporated the preexisting agreement the dealers reached among themselves and was not the result of *bona fide* bargaining. That is a finding of fact, and it is supported in the evidence. Indeed, the majority does not hold that the FTC's finding in this matter is not supported by substantial evidence. Rather, the dealers are simply given another chance on remand to litigate an issue already decided by the Commission and supported by evidence in the record. For this reason, I respectfully dissent from part II of the majority opinion remanding this action to the FTC for reconsideration on the question of whether individual dealers may be able to claim antitrust immunity under the nonstatutory labor exemption.

### III.

I also disagree, for two reasons, with the majority's analysis in part III holding that the Commission erred in employing a *per se* analysis instead of the rule of reason. First, the FTC did not use a *per se* analysis in analyzing whether petitioners' conduct resulted in a restraint of trade. Second, I do not agree that the Commission should have conducted a full rule of reason analysis in this case.

In deciding which analysis to employ, the FTC observed that in recent cases, *Indiana Fed'n of Dentists*, 476 U.S. 447, 106 S.Ct. 2009; *NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); and *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court, instead of applying the *per se* label to restraints which arguably fit within the traditional *per se* analysis, considered the competitive justifications for the restraints without employing the full market analysis necessary for a rule of reason analysis. The FTC thus concluded that "*BMI, NCAA*, and *IFD*, read together, suggest that the *per se* rule

and the rule of reason are converging." The FTC, quoting *Massachusetts Board of Registration in Optometry*, FTC Docket No. 9195, slip op. at 12–13 (June 13, 1988), summarized the three-step inquiry it believed was mandated by the converging rules:

> First, we ask whether the restraint is "inherently suspect." In other words, is the practice the kind that appears likely, absent an efficiency justification, to "restrict competition and reduce output"? For example, horizontal price-fixing and market division are inherently suspect because they are likely to raise price by reducing output. If the restraint is not inherently suspect, then the traditional rule of reason, with attendant issues of market definition and power, must be employed. But if it is inherently suspect, we must pose a *second* question: Is there a plausible efficiency justification for the practice? That is, does the practice seem capable of creating or enhancing competition (e.g., by reducing the costs of producing or marketing the product, creating a new product, or improving the operation of the market)? Such an efficiency defense is plausible if it cannot be rejected without extensive factual inquiry. If it is not plausible, then the restraint can be quickly condemned. But if the efficiency justification is plausible, further inquiry—a *third inquiry*—is needed to determine whether the justification is really valid. If it is, it must be assessed under the full balancing test of the rule of reason. But if the justification is, on examination, not valid, then the practice is unreasonable and unlawful under the rule of reason without further inquiry—there are no likely benefits to offset the threat to competition.

The FTC explained that it used this analysis because it "focus[es] on the economic realities and substantive concerns about competition that ultimately must govern our decisions." The FTC then found, under the first inquiry, that the agreement was inherently suspect as a limitation on output and, under the second inquiry, that there were no plausible efficiency justifications for the agreement. Finding the restriction invalid under the second inquiry, the FTC did not reach the third inquiry's full-blown economic analysis.

Although the *result* reached by this analysis is the same as would have been reached under the *per se* rule—the agreement was found illegal without resort to full economic analysis—the FTC did not use a *per se* analysis. Under a *per se* analysis, the agreement would have been invalid without any consideration of its pro-competitive effects. The FTC, however, did consider the efficiency justifications offered by the respondents before concluding that the agreement had an anticompetitive effect.

Though the majority never concedes the existence of the three-prong "merged" analysis, I believe that this approach is a sensible one. As the Supreme Court observed, "there is often no bright line separating per se from Rule of Reason analysis." *NCAA*, 468 U.S. at 104 n. 26, 104 S.Ct. at 2962 n. 26. Under both rules, "the essential inquiry remains the same—whether or not the challenged restraint enhances competition." *Id.* at 104, 104 S.Ct. at 2961. The merged approach, which recognizes this essential similarity, makes sense because it allows consideration of the economic and efficiency justifications of traditionally *per se* illegal practices, without the often unnecessary, cumbersome and complicated analysis of the rule of reason. The Supreme Court has recognized that a full rule of reason analysis may not be necessary where the anticompetitive effect is obvious. *Indiana Fed'n of Dentists*, 476 U.S. at 459–60, 106 S.Ct. at 2018–19; *NCAA*, 468 U.S. at 109, 104 S.Ct. at 2964; *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). If the justification for the horizontal restraint in dispute is clearly implausible, condemnation of the practice should not be delayed until, under the rule of reason approach, "all aspects of definition, market power, intent, and net competitive effect have been analyzed—a process that many consider to be the antitrust equivalent to Chi-

nese water torture." *Massachusetts Board*, slip op. at 10–11. The FTC found that the hours of operation agreement reduced output and that the respondents offered no plausible economic justification for this agreement. It is eminently sensible that the FTC ended its inquiry there instead of engaging in a rule of reason analysis described by the Supreme Court as " 'an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries ... an inquiry so often wholly fruitless when undertaken.' " *BMI*, 441 U.S. at 8 n. 11, 99 S.Ct. at 1556 n. 11 (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958)).

I also disagree with that portion of part III of the majority opinion wherein the issue of the economic analysis and classification of the dealers' agreement to restrict on the hours of operation is discussed. The FTC, under the first step of the three-prong analysis, concluded that the agreement to restrict hours of operation was inherently suspect as a limitation on output. The majority rejects this conclusion:

> It may be, as stated in another part of the Commission's opinion, that agreed reduction of showroom operating hours is a limitation upon "a form of competition among dealers," but that is not quite the same thing as a limit upon production or output. The analysis made by the Commission for the proposition resulting in its conclusion of limitation of output and anticompetitive effect is based upon *Mass Bd. of Registration in Optometry*, DICT # 9195 (F.T.C. June 13, 1988). The Commission's equation of limited hours and reduction in "output" carried over to its analysis of petitioners' claims of operating efficiency in respect to reducing showroom hours....
>
> ....
>
> Based on what it stated was a "common sense approach," the Commission found limitation of showroom hours to be inherently suspect. It found that a car dealer was "a provider of sales and support services," and that its "output" is not measured in terms of units sold.

(Footnote omitted.) While this might force customers to shift their shopping hours, the commission makes no reference to nearby or suburban car dealers available to many customers not a part of petitioners' association. Citing Robert Bork from *The Antitrust Paradox* (1978), the Commission leaps to the conclusion "there is no economic difference between an agreement to limit shopping hours and an agreement to increase price." ... Unlike this example cited, there is no showing in this case, and the Commission can claim no reliance on a showing of higher prices or profit margins achieved by petitioners compared to other dealers similarly situated.

I disagree with the majority opinion because I find the FTC's reasoning persuasive, and because the majority fails to give any reasons for rejecting the FTC's conclusion.

The FTC first used common sense, an appropriate basis for agency decisionmaking, *Indiana Fed'n of Dentists*, 476 U.S. at 456, 106 S.Ct. at 2016, to show that a mandatory reduction in hours was a limitation on output:

> A consumer may consider any number of factors in deciding where to shop, including price, selection, location, reputation, and service, but surely one of those factors is whether the business provides hours that are convenient to the consumer's schedule. If several competitors are identical in all respects except the business hours they offer, the consumer will choose which ones to patronize on the basis of that difference; the consumer is unlikely to remain indifferent.

The FTC's analysis makes sense when applied to the new car market. Each line dealership sells identical cars. A consumer will patronize a particular dealership because it offers the manufacturer's product, the car, in a better package. That package, which may include a better price, better service on the car, and greater convenience in purchasing the car through extended hours, is the dealer's product. Moreover, these common sense observations are supported by case law. In *Local*

*Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 692, 85 S.Ct. 1596, 1603, 14 L.Ed.2d 640 (1965), the Supreme Court recognized that limitations on hours of operation are an "obvious restraint on the product market." Other courts have agreed that limiting hours eliminates one form of competition. *Jetro Cash & Carry Enter., Inc. v. Food Distribution Ctr.,* 569 F.Supp. 1404, 1415 (E.D.Pa.1983); *Leech v. Highland Memorial Cemetery,* 489 F.Supp. 65, 68 (E.D.Tenn. 1980).

Economic theory also supports the FTC's conclusion that restricting hours restricts the product market:

> We presume that consumers allocate their time in the manner they think is most efficient or beneficial to them. By completely eliminating certain shopping hours, the respondents' agreement forces consumers to shift their car shopping to hours they otherwise would not have chosen for that activity. The forced restructuring of their schedules raises the opportunity cost to consumers of car shopping. This increase in costs encourages consumers to spend less time comparing prices, features, and service, and thereby reduces pressure on dealers to provide the prices, features, and services consumers desire. And even if the amount of time spent shopping remains unchanged, the restriction reduces efficiency, since without it consumers could reorganize their activities in a way that would increase their overall satisfaction.

Former Circuit Judge Robert Bork agreed with this characterization when he compared an agreement among car dealerships to raise prices by $200 and an agreement by dealers to close on Sundays. Although some courts would traditionally be more likely to condemn the price fixing agreement, Judge Bork points out that the two are indistinguishable:

> Both are limitations upon competition whose sole purpose is to increase the dealers' income by restricting output. The output in one case is the number of cars sold (which will decrease with the raised price); the output in the other case is the provision of convenience of shopping to consumers (which will decrease with the Sunday closing).... From the consumers' point of view such agreements are ... indistinguishable. Consumers who lose the convenience of shopping on Sunday are deprived of something that is as much an economic good as is money. There is no acceptable way for a judge to decide that a restriction in the offering of a convenience is any less objectionable than a restriction in the number of automobiles sold.

Bork, *The Antitrust Paradox* 85–86 (1978). I find this economic analysis, upon which the FTC could properly rely, *Indiana Fed'n of Dentists,* 476 U.S. at 456, 106 S.Ct. at 2016, convincing.

Finally, and most importantly, the record supports the FTC's position. The FTC quotes letters from DADA to dealers showing that the "respondents expected the hours restriction to benefit them by limiting comparison shopping." One letter from a DADA executive informed a dealer that the evening closing hours were popular with dealers because "with fewer shopping hours, the public can devote less time to shopping, and consequently forcing down prices." Another letter stated that "the line groups with 100% cooperation have found that this program minimizes shopping by prospective buyers." In addition to the letters, the FTC noted that dealers consistently fought the DADA evening closing program and that the dealerships of no other metropolitan area were closed on Saturdays. The FTC concluded that "[t]he former factor suggests that some dealers in Detroit see a competitive advantage in keeping longer hours than their rivals, and the latter suggests that in cities where there is no agreement to keep showrooms closed, competitive forces lead dealers to keep them open."

Questions concerning the competitive effects of a policy are factual. *Hospital Corp. of America v. FTC,* 807 F.2d 1381, 1386 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987). These factual findings of the FTC, supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion," *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 458, should have been determinative of the issue that the dealers expected to restrict output by limiting hours of operation. 15 U.S.C. § 45(c).

In the end, the majority, while "not agree[ing] in all respects with the Commission's rationale," grudgingly admits that there was no error "in the Commission's conclusion that hours of operation in this business is a means of competition, and that such limitation may be an unreasonable restraint of trade." Because common sense, economic theory, and the record support the FTC's conclusion that the dealers' agreement to restrict their hours of operation was an inherently suspect limitation on output, I disagree with the majority's rejection of that conclusion as well as their unnecessary resort to a rule of reason analysis.

## IV.

My final area of disagreement involves part IV of the majority opinion, where it is "suggested" that the FTC "consider giving dealers an option to maintain showroom hours for at least an *average* of ten and a half hours a day during weekdays, coupled with operation on Saturdays for some minimum additional time" and "consider further whether 30 days is sufficient time to investigate a complaint, have a minimal hearing, and record the findings before expelling a purported violator."

The courts of appeals are permitted to "affirm, enforce, modify, or set aside orders of the Commission...." 15 U.S.C. § 45(d). In examining an FTC remedy, however, a court's review is limited and "extends no further than to ascertain whether the Commission made an allowable judgment in its choice of the remedy." *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612, 66 S.Ct. 758, 759, 90 L.Ed. 888 (1946). "[T]he courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." *Id.* at 613, 66 S.Ct. at 760.

In my view, the FTC's order that the dealers stay open for sixty-four hours per week for a one-year period is "reasonably related" to the unlawful hours of operation agreement. The sixty-four hours per week requirement arose from the FTC's effort not to burden the respondents with inflexible and inefficient requirements, such as complaint counsel's recommendation of specified mandatory hours of operation, while addressing complaint counsel's concerns that without affirmative relief,

> there is no realistic prospect of restoring showroom hours competition to the Detroit market. Dealers individually will decide to remain closed for fear of reprisals if they try to extend hours. Only if many dealers are open at the same time, making enforcement of the restriction difficult or impossible, will the fear of being singled out for enforcement be overcome.

The FTC's order governed only the total number of hours, "restoring the benefits the market would provide consumers absent the respondents' restraint of trade—more convenient shopping and additional leisure time—without forcing dealers to remain open at specifically-mandated hours that may be less beneficial to them than other currently unused hours." The choice of sixty-four hours is reasonable as that figure reflects the average of weekly hours in other Midwestern metropolitan areas where free competition exists.

After observing that the courts will not interfere with an agency-ordered remedy except where the remedy selected has no reasonable relation to the unlawful practices found to exist, the majority promptly interferes with the FTC's hours-of-operation remedy, asking the FTC to consider another proposed option. The problem is that while the majority "questions" whether the FTC's chosen remedy is reasonably related to the dealers' agreement to restrict hours, it fails to find any error requiring this court to modify or set aside the order.

The cases cited by the majority to support the ordered remand involve overly broad or vague Commission orders in mat-

ters of false advertising or deceptive trade practices and do not support its intrusion on the proper province of the FTC in this case. The court in *Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294, 308 (7th Cir.1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980), addressed the faulty application of a remedy to the facts of a case; *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 216–17 (9th Cir.1979), involved a failure by the FTC to fashion a clear and precise remedy; and in *Beneficial Corp. v. FTC*, 542 F.2d 611, 618–20 (3d Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977), the court was concerned with an overly broad prior restraint of speech violative of the first amendment. None of those concerns is present in this case. Moreover, in each of these cases the court found specific errors in the FTC order and, therefore, remedied the erroneous portion of the order or remanded the case for clarification or other specific action by the Commission.

The majority opinion, on the other hand, finds no error, factual or legal, in the FTC order requiring the maintenance of sixty-four hours of showroom operation per week and merely suggests an alternative approach for the Commission to "consider" on remand. There is no warrant for disagreeing with the FTC on this issue when no finding is made that the Commission's decision or order was erroneous. To the extent that the majority finds no fault with the Commission's findings, but nevertheless remands this matter for reconsideration of the ordered remedies with the suggestion that the court has a better idea, it acts beyond its judicial authority.

For these same reasons, I also disagree with the majority's direction to the FTC to consider whether thirty days is sufficient time to investigate a complaint and conduct a hearing. Again, there is no finding of error, no finding of abuse of discretion, and no finding of the lack of substantial evidence. The FTC apparently found thirty days to be sufficient time for these matters. We have no authority—as distinguished from "power"—to question the FTC's decision in this regard or to direct the Commission to "rethink" this matter.

It is not the task of this court to instruct the FTC on how to carry out its mission. We sit for the limited purpose of reviewing the legality of the Commission's actions, not to advise it on "fairer" results or procedures. For these reasons, I strongly but respectfully dissent from part IV of the majority opinion.

V.

In conclusion, I would enforce the FTC's order in its entirety because the Commission's findings of fact are supported by substantial evidence and its conclusions of law are not erroneous.